FILED
2022 Aug-09  PM 01:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **RODNEY COVINGTON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:21-cv-00182 MHH** |
| | } | |
| **KILOLO KIJAKAZI,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

Rodney Covington has asked the Court to review a final adverse decision of the Commissioner of Social Security Administration pursuant to 42 U.S.C. § 405(g). The Commissioner denied Mr. Covington's applications for disability insurance benefits and  supplemental security income based on an Administrative Law Judge's finding that Mr. Covington was not disabled.  Mr. Covington argues that the Administrative Law Judge—the ALJ—erred because the ALJ improperly drew adverse inferences from Mr. Covington's lack of medical treatment and improperly relied on Mr. Covington's daily activities.  Mr. Covington also argues that the RFC the ALJ selected is not supported by substantial evidence and that the Appeals

Council failed to consider supplemental treatment records without explanation. After careful review, the Court affirms the Commissioner's decision.[1]

## LEGAL STANDARD FOR DISABILITY AND SSI

To succeed in his administrative proceedings, Mr. Covington had to prove that he was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." 42 U.S.C. § 423(d)(1)(A).[2] A claimant must prove that he is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

---

[1] Mr. Covington's attorney, Myron Allenstein, recently passed away. The Court expresses its condolences to Mr. Allenstein's family.

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited June 13, 2022).

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or medically equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Mr. Covington applied for disability insurance benefits and supplemental security income on July 10, 2018. (Doc. 11-5, p. 2; Doc. 11-7, pp. 2, 8, 11). Initially, Mr. Covington alleged that his disability began May 15, 2016, but he later amended his onset date to June 28, 2018. (Doc. 11-5, p. 2; Doc. 11-7, pp. 8, 31). The Commissioner denied Mr. Covington's applications on October 30, 2018. (Doc. 11-6, p. 4). Mr. Covington requested a hearing before an Administrative Law Judge. (Doc. 11-6, p. 11). The ALJ held an administrative hearing on January 7, 2020. (Doc. 11-3, p. 121). The ALJ issued an unfavorable decision on February 5, 2020.

(Doc. 11-3, p. 57).  On March 30, 2020, Mr. Covington filed with the Appeals Council exceptions to the ALJ's decision.  (Doc. 11-6, p. 66).  On January 25, 2021, the Appeals Council declined Mr. Covington's request for review (Doc. 11-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. §§ 405(g) and 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Mr. Covington's Medical Records*

To support his applications, Mr. Covington submitted medical records relating to diagnoses and treatment of various medical issues that relate chiefly to Mr. Covington's lumbar fractures, osteoarthritis of the knees and right shoulder, and degenerative disc disease.

On April 7, 2017, Mr. Covington sought treatment at the Cherokee Medical Center Emergency Department.  (Doc. 11-9, p. 29).  Mr. Covington reported that he was assaulted by two men.  Mr. Covington explained that he was kicked in the ribs and flank, he was hit with something that caused a laceration to his eye, and he was bitten on the left shoulder.  (Doc. 11-9, p. 31).  Mr. Covington reported that he had 10/10 sharp pain in his right side, his rib area, and the left side of his face.  (Doc. 11-9, p. 35).  Mr. Covington indicated that he did not have a primary care physician. (Doc. 11-9, p. 36).  Dr. William Hawley treated Mr. Covington in the emergency department.  Dr. Hawley noted that Mr. Covington had equal bilateral grip strength

4

and a steady gait.  (Doc. 11-9, p. 35).  Dr. Hawley noted that Mr. Covington did not appear to be in acute distress, but he was uncomfortable.  (Doc. 11-9, p. 31).

Dr. Hawley ordered CT scans of Mr. Covington's abdomen, pelvis, cervical spine, chest, ribs, and lumbar spine.  (Doc. 11-9, pp. 39-46).  Dr. Hawley cleaned and sutured Mr. Covington's wound near his eye and diagnosed Mr. Covington with "[a]ssault with blunt trauma to right flank and abdomen, fracture of right 2nd and 3rd lumbar vertebra transverse process []; laceration medial left orbit, human bite; contusion right rib cage with tiny right apical pneumothorax; cervical strain with DJD."  (Doc. 11-9, p. 34).

That day, Mr. Covington was transferred to Gadsden Regional Medical Center for observation.  (Doc. 11-9, p. 4). Dr. Sarah Latif treated Mr. Covington.  (Doc. 11-9, p. 4).  Dr Latif noted that Mr. Covington was a 51-year-old with no medical history.  For the most part, Mr. Covington had normal findings from his respiratory, cardiovascular, abdomen, and psychiatric exams.  (Doc. 11-9, pp. 5, 8).  Mr. Covington's chest x-ray showed no acute findings, and he exhibited normal range of motion in his upper and lower extremities.  (Doc. 11-9, pp. 8, 10).

Mr. Covington was admitted overnight for observation, and a neurosurgeon, Dr. James White, was consulted "due to presence of transverse fractures to the L2 and L3 vertebrae."  (Doc. 11-9, p. 4).  Mr. Covington was discharged with diagnoses of non-displaced transverse fractures of the L2-L3 vertebra, a human bite on the

shoulder, and a laceration near his eye.  (Doc. 11-9, p. 4).  Dr. White noted that Mr. Covington had a normal gait and station.  (Doc. 11-9, p. 2).  Mr. Covington received a tetanus shot and prescriptions for Augmentin, Flexeril, nicotine patches, and Norco.  (Doc. 11-9, pp. 4).  Mr. Covington was in stable condition at discharge, and he was instructed to follow up in one week with Dr. White and his primary care physician, identified in the GRMC record as Dr. Hawley.  (Doc. 11-9, p. 5).[3]

On April 14, 2017, Mr. Covington visited the emergency department at Cherokee Medical Center.  (Doc. 11-9, p. 23).  Mr. Covington complained of low back pain.  Mr. Covington reported that the pain in the right side of his back and ribs had gradually worsened, and he rated the pain 9/10.  (Doc. 11-9, p. 26).  He had run out of Norco.  (Doc. 11-9, p. 23).

Dr. Hawley's exam revealed mostly normal findings, including a normal gait, but Dr. Hawley indicated that Mr. Covington had moderate back pain, painful range of motion, vertebral tenderness at L2, L3, and L4, muscle spasms in his lumbar area and sacrum, and pain with straight leg raises.  (Doc. 11-9, p. 23).  Dr. Hawley instructed Mr. Covington to apply heat to his back, to contact the back specialists who treated him at Gadsden Regional, and to take Norco for breakthrough back pain.

---

[3] Dr. Hawley is the emergency room physician who treated Mr. Covington at Cherokee Medical Center.  (Doc. 11-9, p. 31).  There is no evidence in the record that Dr. Hawley is Mr. Covington's primary care physician.

(Doc. 11-9, pp. 24, 54).  Mr. Covington received prescriptions for Anaprox, Norco (10 tablets), and Robaxin.  (Doc. 11-9, p. 24).

On May 2, 2017, Mr. Covington visited Cherokee Medical Center to have the sutures removed from his eye laceration.  (Doc. 11-9, p. 16).  Mr. Covington reported that he was not in pain.  (Doc. 11-9, p. 19).  Two sutures were removed, and the doctor caring for Mr. Covington noted that Mr. Covington had a 3mm pustule that was evacuated and cleaned.  (Doc. 11-9, p. 16).  Otherwise, Mr. Covington's physical exam produced normal findings including a normal gait.  (Doc. 11-9, pp. 16, 19).  Mr. Covington was instructed to perform wound care twice a day, to complete antibiotics, and to have his wound rechecked in seven days.  (Doc. 11-9, p. 17).

At the request of Disability Determination Services, on October 3, 2018, Mr. Covington visited Vester Health Center for an evaluation.  (Doc. 11-9, p. 51).  Mr. Covington reported that he had suffered with back pain for more than 10 years. (Doc. 11-9, p. 51).  Mr. Covington reported that his pain was sharp and severe at times, and the pain had become constant over the preceding year and a half.  (Doc. 11-9, p. 51).  Mr. Covington stated that his pain limited his ability to sleep, stand, sit, and walk.  (Doc. 11-9, p. 51).  Mr. Covington indicated that over-the-counter NSAID's helped his back pain.  (Doc. 11-9, p. 51).

Dr. Vester noted that Mr. Covington fractured his spine in 2017, and Mr. Covington had surgery on his left knee because of a baseball injury. (Doc. 11-9, p. 51). Dr. Vester indicated that Mr. Covington had left knee pain and stiffness episodically during cool or moist weather. (Doc. 11-9, p. 52). Dr. Vester noted that Mr. Covington had episodic pain in his right shoulder that increased with use and when he was lying down. (Doc. 11-9, p. 52). Dr. Vester found mild crepitus in both knees, a 20-degree difference in his right and left shoulder abduction range of motion, and a 50-degree difference between right and left shoulder internal rotation. (Doc. 11-9, p. 52). Mr. Covington retained full extension to 120 degrees flexion in both knees. (Doc. 11-9, p. 52). Mr. Covington's back had no gross deformities, but he was moderately tender over the spine and left paraspinal lumbar region, with some tender spasms to the right trapezius. (Doc. 11-9, p. 52). The range of motion in Mr. Covington's dorsolumbar had flexion of 80 degrees, extension of 20 degrees, and right and left lateral flexion and rotation of 20 degrees. (Doc. 11-9, p. 52). Dr. Vester noted that Mr. Covington had a normal gait, he could squat and rise, and he could heel and toe walk. (Doc. 11-9, p. 53). Mr. Covington had normal motor and grip strength bilaterally, no muscular atrophy, and normal fine and gross motor use of his hands. (Doc. 11-9, p. 53).

Dr. Vester diagnosed Mr. Covington with posttraumatic pain of the lumbar spine, osteoarthritis of the knees, and right shoulder degenerative joint disease.

(Doc. 11-9, p. 53). Dr. Vester concluded that Mr. Covington was moderately limited by his back disorder and right shoulder degenerative joint disease and mildly limited by his knee arthritis. (Doc. 11-9, p. 53). Considering his examination findings, Dr. Vester opined that Mr. Covington was moderately limited in standing, walking, and lifting and carrying objects. "He is mildly limited with sitting. He is not limited with hearing or speaking. He is mildly limited with handling objects. He is moderately limited with traveling." (Doc. 11-9, p. 53).

Mr. Covington had an appointment for an initial evaluation with Dr. Deborah Trujillo-Bolden at Cherokee Medical Center on January 28, 2019. (Doc. 11-9, p. 69). Mr. Covington's chief complaint was right lower back pain that had started five to six days earlier. (Doc. 11-9, p. 74). Mr. Covington reported that he had "washed the car and after [he] was done and sat down, [his] back started hurting and it ha[d]n't let up since." (Doc. 11-9, p. 74). Mr. Covington reported that he had had similar pain a year earlier, but his back had not really hurt since that time. (Doc. 11-9, p. 74). Mr. Covington described his pain as a sharp pain in his right lower back region that radiated to his buttock area. (Doc. 11-9, p. 74). Mr. Covington reported that his pain was 10/10 and that the pain worsened with movement and but improved somewhat when he would lie on a hard surface. (Doc. 11-9, p. 74).

Mr. Covington had normal range of motion and strength in his upper and lower extremities bilaterally. (Doc. 11-9, p. 74). Mr. Covington displayed a positive

straight right leg test to 100 degrees, and he had an antalgic gait.  (Doc. 11-9, p. 74).[4]

Other than that, Dr. Trujillo-Bolden's review of Mr. Covington's symptoms was

negative.  (Doc. 11-9, p. 78).  Dr. Trujillo-Bolden diagnosed Mr. Covington with

acute lumbar back pain, lumbago with sciatica on the right side, and a sprain of the

ligaments of the lumbar spine. (Doc. 11-9, pp. 71-72).   Dr. Trujillo-Bolden

prescribed Robaxin and tramadol.  (Doc. 11-9, pp. 72, 75).

Mr. Covington visited Cherokee Medical Center on July 13, 2019 for a rash.

(Doc. 11-9, pp. 60-64).  He also reported acute lumbar back pain and right-side

sciatica.  (Doc. 11-9, pp. 61-62).  The record contains no information about Mr.

Covington's range of motion, gait, or muscle strength.  Mr. Covington received a

prescription for a topical cream.  (Doc. 11-9, p. 62).

On March 13, 2020, Mr. Covington visited Cherokee Medical Center because

he felt weak.  (Doc. 11-4, p. 4).  Mr. Covington was working at a facility, cleaning

it, when "he started feeling some weakness and some nauseous feeling[,] . . [but] he

denie[d] any other symptoms."  (Doc. 11-4, p. 13).  Mr. Covington had normal

muscle strength and tone and normal muscle strength bilaterally.  (Doc. 11-4, p. 14).

---

[4] "An antalgic gait is a disruption in a person's walking pattern that's usually caused by pain. In
an antalgic gait, the phase when you stand is shorter than when you swing the other leg forward to
take    the    next    step.    This    causes    you    to    walk    unevenly."
https://www.healthline.com/health/antalgic-gait (last visited Aug. 8, 2022).

Mr. Covington was screened for a heart event and the flu, and he was treated with Zofran for nausea.  (Doc. 11-4, p. 18).

*Mr. Covington's Administrative Hearing*

Mr. Covington's administrative hearing took place on January 7, 2020.  (Doc. 11-3, p. 121).  Mr. Covington testified that he had not worked since June of 2018.  (Doc. 11-3, p. 124).  Mr. Covington's father and uncle helped support him financially, and his daughters helped him care for himself.  (Doc. 11-3, pp. 124, 127).  Mr. Covington stated that his daughters helped him shower, dress, and go to the grocery store.  (Doc. 11-3, p. 127).  Mr. Covington testified that his daughters helped with meals; he could make quick meals like cereal or a sandwich.  (Doc. 11-3, p. 139).  Mr. Covington stated that it was difficult for him to get in and out of a car because of the bending required.  (Doc. 11-3, p. 131).  He stated that it hurt his back to ride in the car for too long.  (Doc. 11-3, p. 138).  He testified that he could not lift a gallon of milk without being in pain. (Doc. 11-3, p. 140).

Mr. Covington testified that he had not had medical treatment for back pain since July of 2019.  (Doc. 11-3, p. 126).  He stated that no doctor had told him that his functioning was restricted.  (Doc. 11-3, pp. 126-27).  Mr. Covington testified that after his vertebrae were fractured, his pain had increased.  He explained that it was difficult for him to get out of bed in the morning and that his injury caused elbow pain because he used his elbows to push himself out of bed.  (Doc. 11-3, p. 127).

Mr. Covington testified that he "stay[ed] in constant pain all the time. . . . they was, wanting me to have surgery but of course I didn't have insurance so I couldn't have surgery." (Doc. 11-3, pp. 127-28). Mr. Covington stated that the pain in his neck, elbows, and back was constant and not improving. (Doc. 11-3, p. 128).

The ALJ noted that on Mr. Covington's last visit to the doctor on July 13, 2019, he complained of back pain but was treated only for a rash. (Doc. 11-3, p. 129). The ALJ pointed out that when Mr. Covington went to the doctor on January 28, 2019 complaining of back pain, he reported that he had not been in much pain for the better part of a year. (Doc. 11-3, p. 129). Mr. Covington stated that he did not remember making that statement to the doctors, and he testified that it was not accurate. (Doc. 11-3, p. 129).

Mr. Covington testified that he had experienced back pain for years. (Doc. 11-3, p. 129). The ALJ asked Mr. Covington whether he had seen a pain management specialist. Mr. Covington stated that he was referred to a back specialist. (Doc. 11-3, p. 130). The ALJ asked Mr. Covington whether any doctors had prescribed an assistive device for his back pain. (Doc. 11-3, p. 132). Mr. Covington responded, no. (Doc. 11-3, p. 132). Mr. Covington testified that he did not have insurance, so he could not seek treatment, but he would go to the emergency room if he was hurting badly enough. (Doc. 11-3, p. 135). Mr. Covington stated that he took only over-the-counter medications for his back pain. (Doc. 11-3, p.

135).  He also testified that the pain was like spasms in his back, neck, or arms. (Doc. 11-3, p. 136).  Mr. Covington testified that sitting or standing sometimes helped his pain, but he could not do either for more than 15 minutes.  (Doc. 11-3, p. 136).

Mr. Covington stated that he had bilateral osteoarthritis in his knees from a baseball injury.  (Doc. 11-3, p. 136).  He testified that on a typical day, he tried to sleep, but sleep was rare.  (Doc. 11-3, p. 137).  He explained that he normally slept on the couch because it was easier for him to get off the couch than the bed.  (Doc. 11-3, pp. 137-38).  Mr. Covington explained that most mornings, he could not put on socks.  (Doc. 11-3, p. 137).  Mr. Covington testified that he could walk about 20-30 yards before he had to lean on something to rest.  (Doc. 11-3, p. 141).  Mr. Covington testified that because of his back pain, he could not reach overhead without pain.  (Doc. 11-3, p. 142).

Dr. Bassey A. Duke, a vocational expert, testified at Mr. Covington's administrative hearing.  Dr. Duke testified that Mr. Covington had worked as a carwash attendant from May of 2010 to May of 2016.  (Doc. 11-3, p. 145).  The ALJ asked Dr. Duke to consider an individual:

> closely approaching advanced age, who has a high school education, and work experience as a car wash attendant, as you've described that job. This individual can perform a range of medium exertion, as the Administration has defined that term; however, as part of the job requirement, this individual would not climb ladders, ropes, or scaffolds; would not reach overhead with right dominant upper

> extremity; and, would not perform around hazards. The individual
> could occasionally stoop, kneel, or crouch. Given those limitations
> could this hypothetical individual perform the car was attendant job?"

(Doc. 11-3, p. 146).

Dr. Duke testified that the individual could not perform Mr. Covington's past

work, but the individual could perform the jobs of a hand packager, dish washer, and

price marker. (Doc. 11-3, pp. 146-47). The ALJ posed a second hypothetical with

the same "general profile regarding age, education, and work experience[,]" but the

individual was:

> limited to a range of light exertion . . . However, this individual . . .
> [c]ould not climb ladders, ropes, or scandals; [c]ould not reach
> overhead with the right dominant upper extremity; and would not
> perform around hazards. The individual could occasionally stoop,
> kneel, or crouch. . . . crawl . . The individual could occasionally climb
> stairs, with the use of a handrail. The individual would need the
> opportunity to change postures from an upright standing or walking
> posture to a seated posture, . . . [b]ut it would not be on a timed or
> mechanical basis; however, it would not occur any more frequently than
> every 30 minutes, and might not occur every time, but not more
> frequently than that.

(Doc. 11-3, pp. 147-48). Dr. Duke testified that the individual could not perform

Mr. Covington's past work, but the individual could perform the jobs of price

marker, document preparer, and ticket checker. (Doc. 11-3, p. 149).

For a third hypothetical, the ALJ used the same profile, with additional

limitations based on additional breaks. (Doc. 11-3, p. 149). Dr. Duke testified that

normally, workers receive 5-10 minutes breaks in the morning with a 30 minute to

one hour break for lunch, followed by an additional 5-10-minute break in the

afternoon.  (Doc. 11-3, p. 149).  Dr. Duke explained that typically, employers tolerate about 5-10 minutes of an eight-hour workday off task and tolerate one absentee day per month.  (Doc. 11-3, pp. 149-50).  Dr. Duke testified that his testimony concerning sitting, standing, off task behavior, and absenteeism were not consistent with the DOT but were based on his knowledge and personal training over 18 years.  (Doc. 11-3, p. 150).

## THE ALJ'S DECISION

The ALJ found that Mr. Covington had not engaged in substantial gainful activity since June 28, 2018, his alleged onset date.  (Doc. 11-3, p. 63).  The ALJ determined that Mr. Covington suffered from the severe impairments of status post non-displaced lumbar fractures with residual pain and osteoarthritis of the knees and right shoulder.  (Doc. 11-3, p. 63).  The ALJ also determined that Mr. Covington had the non-severe impairments of degenerative disc disease, obesity, nicotine dependence, lacerations, contusions, and slight pneumonia.  (Doc. 11-3, p. 63). Based on a review of the medical evidence, the ALJ concluded that Mr. Covington did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 11-3, p. 63).

Given these impairments, the ALJ evaluated Mr. Covington's residual functional capacity.  (Doc. 11-3, p. 63).  The ALJ determined that Mr. Covington had the RFC to:

> perform light work . . . except: the claimant is unable to climb ladders, ropes or scaffolds; reach overhead with the right dominant upper extremity; crawl; or perform around hazards. The claimant can occasionally stoop, kneel crouch; or climb stairs with the use of a hand rail. The claimant needs the opportunity to change postures from an upright (standing or walking) posture to a seated posture, and vice versa, but [] it would not be on a timed or mechanical basis and would not occur more frequently than every 30 minutes and might not occur every time.  The claimant would not have jobs with constant lifting and carrying even at the light level; and there would be breaks from lifting and carrying besides the usual breaks at the end of standard industrial period, with lifting and carrying being somewhere between frequent and constant.

(Doc. 11-3, p. 63).  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  "If someone can do light work . . . he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves

sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Mr. Covington had no past relevant work.  Therefore, transferability of job skills was not an issue.  (Doc. 11-3, p. 66).  Relying on VE testimony, the ALJ found that jobs existed in significant numbers in the national economy that Mr. Covington could perform, including price marker, document preparer, and ticket taker.  (Doc. 11-3, p. 67).  Accordingly, the ALJ determined that Mr. Covington was not under a disability within the meaning of the Social Security Act.  (Doc. 11-3, p. 67).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s]   the ALJ's 'factual   findings   with   deference'   and   [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as

adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *Lack of Significant Medical Treatment*

Substantial evidence supports the ALJ's determination that Mr. Covington did not have "on-going aggressive treatment or any evidence of consistent or persistent significant abnormal objective findings." (Doc. 11-3, p. 64). In the Eleventh Circuit, an applicant's refusal to follow prescribed medical treatment without a good reason

precludes a finding of disability, but if a claimant does not comply because he cannot afford prescribed treatment, the claimant's noncompliance is excused. *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988).    When an ALJ relies on noncompliance to deny benefits, and the record contains evidence of financial inability to comply, the ALJ must determine whether the claimant was able to afford the prescribed treatment.    If the ALJ's decision is not significantly based on noncompliance, then a failure to consider the ability to afford prescribed treatment does not constitute reversible error. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).

Here, the ALJ did not base his decision solely or really at all on noncompliance with a prescribed course of treatment.  (Doc. 16, p. 8; Doc. 11-3, p. 64).  The ALJ noted that Mr. Covington had not had consistent medical treatment and that no doctor had ordered aggressive treatment of Mr. Covington's back pain. (Doc. 11-3, p. 64).  Mr. Covington testified that his doctors had ordered more aggressive treatment, but his medical records are silent in this regard.  According to Mr. Covington's medical records, a doctor recommended a back specialist only once during Mr. Covington's April 14, 2017 appointment at Cherokee Medical Center, one week after his assault.  (Doc. 11-9, pp. 24, 54).  During Mr. Covington's later visits, emergency room physicians prescribed pain medication but did not recommend more aggressive treatment. (Doc. 11-3, p. 64).

In 2017, following the assault that caused lumbar fractures and an eye laceration, Mr. Covington visited Gadsden Regional Medical Center once and Cherokee Medical Center three times.   In 2019, Mr. Covington visited the emergency room twice:  once in January for back pain and once in July for a rash. (Doc. 11-9, p. 61, 74).  During the January visit, Mr. Covington stated that his back had not bothered him very much in the preceding year.  (Doc. 11-9, p. 74).  In 2020, Mr. Covington visited the emergency room once and complained of weakness and nausea.  (Doc. 11-4, p. 13).

Thus, the ALJ's decision is not "inextricably [] tied to the finding of noncompliance." *Dawkins*, 848 F.2d at 1214.  Mr. Covington's medical records indicate that he was willing to visit the emergency room when he felt he had a medical need.  Mr. Covington's 2019 medical record indicates that when he visited the emergency department at Cherokee Medical Center seeking treatment for back pain, he stated that his back had not hurt him badly in the preceding year.  When Mr. Covington sought treatment for back pain, he was prescribed muscle relaxers and Norco for breakthrough pain; Mr. Covington generally used over-the-counter medication to address pain.   Substantial evidence supports the ALJ's findings regarding lack of aggressive, ongoing medical treatment.

*Daily Activities*

Substantial evidence supports the ALJ's decision regarding Mr. Covington's subjective complaints of pain.  In assessing a claimant's testimony regarding pain, an ALJ must consider objective medical evidence; other evidence including statements regarding intensity of pain; medical sources; treatment history; non-medical sources; and the seven factors set forth in 20 C.F.R. 404.1529(c)(3) and 416.929(c)(3).   20 C.F.R. § 404.1529(c)(3) (2017); 20 C.F.R. § 416.929(c)(3) (2017).

SSR 16-3p is the starting point for an analysis of an individual's symptoms. SSR 16-3p, 2017 WL 5180304.  Under SSR 16-3p, an ALJ first must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms."  SSR 16-3p, 2017 WL 5180304.  Next, the ALJ must evaluate the intensity and persistence of an individual's symptoms.  SSR 16-3p, 2017 WL 5180304.  Under step two, the ALJ must consider objective medical evidence and other evidence including medical sources, non-medical sources, and the factors set forth in 20 C.F.R. 404.1529(c)(3) and 416.929(c)(3).  The seven factors set forth in 404.1529(c)(3) and 416.929(c)(3) are:

1.  Daily activities;

2.  The location, duration, frequency, and intensity of pain or other symptoms;

21

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3) (2017); 20 C.F.R. § 416.929(c)(3) (2017). If an ALJ discredits a claimant's testimony regarding subjective symptoms, he must give "adequate reasons" showing that he considered the claimant's condition as a whole. *Davis v. Comm'r of Soc. Sec.*, 449 Fed. Appx. 828, 834 (11th Cir. 2011) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). An ALJ may not give a cursory citation to a claimant's daily activities as the sole basis for his decision. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1987). A claimant's daily activities are not dispositive of a claimant's ability to work.

In *Dyer*, the ALJ found that the claimant had a medical condition but concluded that the evidence did not substantiate the severity of the condition that the claimant described. Dyer, 395 F.3d at 1209. The ALJ found that the claimant's

complaints were inconsistent with the claimant's daily activies, the frequency of his symptoms, and the type and dosage of his prescribed medications. *Dyer*, 395 F.3d at 1209. The Eleventh Circuit held the ALJ properly relied on the claimant's daily activities, the frequency of his symptoms, and the types and dosages of his medications to conclude that the claimant's subjective complains were not consistent with his testimony and the medical record. *Dyer*, 395 F.3d at 1211.

Here, the ALJ followed the two-step process under SSR 16-3p. (Doc. 11-3, p. 64). The ALJ noted that Mr. Covington had a medically determinable impairment which reasonably could be expected to produce pain. (Doc. 11-3, p. 64). But Mr. Covington's medical records, described above, did not substantiate the degree of pain and limitation he described in his testimony. Substantial evidence supports the ALJ's subjective pain analysis.

*RFC*

Mr. Covington argues that his RFC is conclusory and violates SSR-96-8p. (Doc. 15, p. 18-19); SSR 96-8p, 1996 WL 375184. Mr. Covington also asserts that because the ALJ's RFC for light work is conclusory, he should be limited to sedentary work which, under Grid Rules 201.9 and 201.10, would entitle him to benefits. (Doc. 15, p. 19). Substantial evidence supports an RFC for light work.

Mr. Covington correctly points out that an RFC must "include a narrative discussion describing how the evidence supports each conclusion, citing specific

medical facts . . . and nonmedical evidence." (Doc. 15, p. 21). He cites *Walker v. Bowen* to support his contention that his RFC assessment does not rest on substantial evidence and that the ALJ did not provide a narrative discussion of the evidence to support his RFC. (Doc. 14, p. 19); *Walker v. Bowen*, 826 F.2d 996 (11th Cir. 1987).

The record in *Walker* is very different from the record here. In *Walker*, the medical evidence showed that the claimant had a gunshot wound to her ankle, that she had surgery on the ankle, and that two doctors had concluded that, because of her injuries, she could not hold a job that required walking or standing, and she could not hop, squat, tandem gait, or heel toe walk. *Walker*, 826 F.2d at 998. The doctors also opined that she could not walk without a cane or assistive device. *Walker*, 826 F.2d at 998. The claimant saw another doctor for hypertension and gastrointestinal problems. *Walker*, 826 F.2d at 998. This doctor reported that the claimant had no serious physical disability, but the doctor did not mention the claimant's ankle injury. *Walker*, 826 F.2d at 998. In his opinion, the ALJ summarized the reports of two of Ms. Walker's doctors but did not mention one of Ms. Walker's doctors who had treated her ankle injury for years. *Walker*, 826 F.2d at 1000. Furthermore, the ALJ did not consider the combined effects of Ms. Walker's impairments. *Walker*, 826 F.2d at 1001. On this record, the Eleventh Circuit remanded the case "for review of all of the evidence under the proper legal standards." *Walker*, 826 F.2d at 1002.

Here, the medical evidence contains no records that indicate that Mr. Covington had severe limitations or restrictions in job function because of his back injury in 2017.  The ALJ reviewed the limited medical evidence; he considered Mr. Covington's 2017 lumbar spine views, the 2018 one-time examination by Dr. Vester who described mild and moderate functional restrictions, the 2019 medical records which showed an exacerbation of Mr. Covington's back pain, and each of the medical opinions in the record.  The ALJ provided a narrative discussion describing the medical evidence and the extent to which the ALJ found the evidence persuasive. (Doc. 11-3, pp. 64-65).  The ALJ found persuasive the fact that when Mr. Covington sought treatment for back pian in 2019, he stated that he had not struggled with pain for the better part of a year.[5]  Thus, the ALJ did not submit a conclusory RFC for Mr. Covington.

Consistent with SSR 96-8p, the ALJ included in Mr. Covington's RFC limitations that corresponded to Dr. Vester's functional restrictions and some of Mr. Covington's testimony.  (Doc. 11-3, p. 63).  The ALJ stated, for example, that Mr. Covington could not "climb ladders, ropes, or scaffolds; reach overhead with the right dominant upper extremity; crawl; or perform around hazards."  (Doc. 11-3, p.

---

[5] At his administrative hearing, Mr. Covington stated that he did not recall the statement, and he denied making it.  (Doc. 9-3, p. 129).  The ALJ properly relied on the information in Mr. Covington's medical record because that information is consistent with the evidence in Mr. Covington's medical records as a whole.

63-66).  The ALJ included in Mr. Covington's RFC workday breaks necessary for Mr. Covington to perform his job functions.  (Doc. 11-3, p. 63).

Because the ALJ's RFC conforms to the medical evidence, Mr. Covington's reliance on *Thomason v. Barnhart* and *Coleman v. Barnhart* is misplaced.  (Doc. 15) (citing *Thomason v. Barnhart*, 344 F.Supp.2d 1326, 1328 (N.D. Ala. 2004), and *Coleman v. Barnhart*, 264 F.Supp.2d 1007, 1010 (S.D. Ala. 2003)).  In *Thomason* and *Coleman*, the records contained no evidence that the plaintiffs could perform medium work.  *Thomason*, 344 F.Supp.2d at 1328; *Coleman*, 264 F.Supp.2d at 1010-11.  Thus, there was no evidence that the claimants could perform work-related physical activities like bending, lifting, standing, walking.  *Thomason*, 344 F.Supp.2d at 1329; *Coleman*, 264, F.Supp.2d at 1010-11.  Here, the ALJ's RFC for Mr. Covington is consistent with the evidence in the administrative record.[6]

Accordingly, substantial evidence supports Mr. Covington's RFC for light work with restrictions tailored to his functional limitations.

### Appeals Council

Mr. Covington asserts that the Appeals Council did not consider the supplemental medical evidence that he submitted to it.  He asks the Court to remand and require an evaluation of his supplemental evidence.  (Doc. 15, p. 24).

---

[6] The hypothetical questions that the ALJ posed to the VE to help develop an RFC also properly capture the medical evidence in the record.

A benefits claimant may present new evidence at each stage of the administrative process. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007).  The Appeals Council does not have to consider all supplemental evidence submitted to it; the Appeals Council "must consider new, material, and chronologically relevant evidence." *Ingram*, 496 F.3d at 1261; *see also* 20 C.F.R. § 404.970(b) (2020); 20 C.F.R. § 416.1470(b) (2020).  Materiality in this context means evidence that creates "a reasonable possibility" of a "change [in] the administrative result." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987); *see also Washington v. Comm'r of Soc. Sec. Admin.*, 806 F.3d 1317, 1321 (11th Cir. 2015). "[W]hen the Appeals Council erroneously refuses to consider evidence, it commits legal error and remand is appropriate." *Washington*, 806 F.3d at 1321.

In *Washington*, the plaintiff submitted to the Appeals Council medical records which the plaintiff acquired after the ALJ's administrative hearing. *Washington*, 806 F.3d at 1321-23.  The Eleventh Circuit found that the supplemental medical records were new and chronologically relevant because the records reflected the claimant's treatment during the relevant time period and contained new findings consistent with prior diagnoses.  Thus, the supplemental records related back to the relevant disability period. *Washington*, 806 F.3d at 1322.  The Eleventh Circuit also found that there was a reasonable probability that the supplemental records would cause the administrative result to change. *Washington*, 806 F.3d at 1322.  The

Eleventh Circuit remanded the case to the Commissioner for consideration of the new evidence "in conjunction with all the other evidence in the record." *Washington*, 806 F.3d at 1323.

Here, Mr. Covington provided to the Appeals Council records from his doctor's visit on March 13, 2020. (Doc. 11-4, pp. 2-21). This visit occurred after the ALJ's hearing on January 7, 2020. (Doc. 11-3, p. 121). The March 2020 records are not material, even if they are new and chronologically relevant. In March of 2020, Mr. Covington visited the ER because he felt weak and nauseated. (Doc. 11-4, p. 9, 13). Mr. Covington looked ill, but his physical examination was normal. He displayed normal muscle strength. (Doc. 11-4, pp. 14, 18). The March 2020 record contains a notation about Mr. Covington's back diagnoses, but the doctor who examined Mr. Covington in the ER did not treat Mr. Covington for back pain. (Doc. 11-4, p. 2-21). Mr. Covington received a prescription only for Zofran to treat nausea. (Doc. 11-4, p. 9). Thus, Mr. Covington's ER visit in 2020 is unrelated to Mr. Covington's impairments, and the supplemental record is not reasonably likely to change the administrative result. This is especially so because the 2020 record demonstrates that Mr. Covington began to feel weak and nauseous while doing maintenance work, (Doc. 11-4, p. 13), suggesting that he felt well enough to perform physical labor before he became ill. Therefore, the Appeals Council's failure to mention the supplemental record in its denial letter is harmless error.

## CONCLUSION

For the reasons discussed above, ALJ's decision rests on substantial evidence, and the ALJ applied proper legal standards. The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner's decision. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this August 9, 2022.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE